# Third District Court of Appeal

## State of Florida

Opinion filed April 8, 2026.
Not final until disposition of timely filed motion for rehearing.

_____

No. 2D24-1279
Lower Tribunal No. 21-CA-189-P
_____

**Bal Harbour Shops Marketplace, LLC,**
Appellant,

vs.

**ORU Associates, Inc.,**
Appellee.

An Appeal from the Circuit Court for Monroe County, Luis Garcia, Judge.

Gunster, Yoakly & Stewart, P.A., and Simon M. Lassel, and H. Eugene Lindsey, III, for appellant.

Rumberger, Kirk & Caldwell, P.A., and David B. Shelton (Orlando), and Robert V. Fitzsimmons, for appellee.

Before FERNANDEZ, MILLER and BOKOR, JJ.

FERNANDEZ, J.

Bal Harbour Shops Marketplace, LLC ("Bal Harbour") appeals the trial court's final judgment entered against it and in favor of ORU Associates, Inc. ("ORU") following a bench trial, as well as the denial of Bal Harbour's motion for rehearing and/or reconsideration, and/or to alter or amend the final judgment. For the reasons that follow, we reverse.

## BACKGROUND

Bal Harbour and ORU executed a commercial lease in December 2020 ("the Lease"). The leased premises was the first floor of a building in Ocean Reef, Monroe County, which Bal Harbour, the tenant, accepted in "as is" condition. The "term" of the Lease is governed by section 2.1, and provides:

> Section 2.1. Term. The term of this Lease ("Term") shall begin on the Effective Date (also, the "Lease Commencement Date"), and end on **4/30/2021** ("Lease Expiration Date"), subject to Section 2.2. Notwithstanding anything contained in this Lease to the contrary, during the initial term of this Lease [Bal Harbour] shall have the right, for any or no reason, to terminate this Lease on thirty (30) days' notice to [ORU]. Said right expires on April 30, 2021 whether or not [Bal Harbour] exercises the option to Extend provided in Section 2.2 below.

(emphasis in original). Section 2.2 provided that Bal Harbour had the right to extend the Lease to April 30, 2030. Further, if Bal Harbour extended the Lease, it had the right to remodel the leased premises, and the rent would

2

be abated during remodeling for up to six months or upon Bal Harbour's "re-opening for business in the leased premises," whichever comes earlier.

Article III of the Lease addressed Bal Harbour's obligations to pay rent and provided that it does not have to pay rent until the initial work is substantially completed, and Bal Harbour opens for business:

> Section 3.1. "Base Rent". The parties agree that, commencing as of the date on which [Bal Harbour] has substantially completed [Bal Harbour's] Initial Work and opened for business in the leased premises (the "Rent Commencement Date"), Base Rent in the amount of $22,000 per month, adjusted annually if the Option to Extend is exercised . . . plus Florida Sales Tax shall be payable in monthly installments.
>
> . . . .
>
> Section 3.4. Initial Payment of "Base Rent". Notwithstanding anything to the contrary contained in this Lease, nor to the status of [Bal Harbour's] improvements, if any, to the leased premises, [Bal Harbour] shall pay to [ORU], on or before Lease Commencement Date, the first monthly installment of "Base Rent".

In addition, paragraph 4.1 of the Lease required Bal Harbour to pay the security deposit when the Lease was executed, and ORU could use the security deposit if Bal Harbour defaulted under the Lease. Furthermore, section 4.4 provided:

> Section 4.4. Refund of Security Deposit. If [Bal Harbour] shall fully and faithfully comply with all of the

3

terms, provisions, covenants and conditions of this Lease, the security deposit shall be returned to [Bal Harbour], without interest, within the time required by law, and after delivery of entire possession of the leased premises to [Bal Harbour].

Article V addressed the use of the leased premises, alterations, and improvements and stated the following:

Section 5.1. Use of leased premises. [Bal Harbour] shall use and occupy the leased premises for the operation of any extension of the "Bal Harbour Shops Marketplace," including the right to display and sale, at retail, goods, and any related purpose, including various popup uses, trunk shows, and other marketplace activities as determined by [Bal Harbour], and/or . . . any other lawful use related in any way to "Bal Harbour Shops" and/or any of its tenants (the "Permitted Use") and for no other use or purpose[.]

Section 5.3. Alterations. Except for the initial cosmetic renovations (including without limitations, installation of FFE [furniture, fixture, and equipment] and changes to floors, lights and painting), [Bal Harbour] shall not make any alterations in or to the leased premises without first obtaining the written approval and consent from [ORU], which approval and consent may not be unreasonably delayed, conditioned, or withheld.

Section 5.5. Improvements. [Bal Harbour] shall cause any of the proposed improvements (collectively, the "Improvements") set forth on the proposed "Plans" to be constructed on the leased premises in accordance with construction plans and specifications covering the proposed Improvements (collectively, the "Plans") and ORCA Rules. . . .

4

Section 8.2 provided that the following acts, among others, by Bal Harbour constituted an "event of default":

> (i) If [Bal Harbour] fails to pay any installment of rental or other monetary obligation hereunder, within ten (10) days following written notice of past due.

> (ii) If [Bal Harbour] breaches any of the other conditions, stipulations or covenants contained herein, and if such breach of condition shall condition for a period of thirty (30) days after [Bal Harbour's] receipt of written notice thereof from [ORU]; or, if such default is of a nature which cannot be cured with such 30-day period, [Bal Harbour] fails to commence connecting such default within such 30-day period and to diligently continue to correct the same until such default if fully cured[.]

The Lease also provided in section 13.7 that "[t]ime is of the essence," and section 13.8 provided that the "[l]ease contains the entire agreement between the parties."

On March 12, 2021, Bal Harbour provided notice to ORU that it was terminating the Lease, stating, "As the Rent Commencement Date did not occur, we would ask that you return the initial rent payment and security deposit in the collective amount of $45,540." Bal Harbour explained that due to permitting issues, it was unable to open for business. After ORU refused to return the funds, Bal Harbour initiated the underlying breach of contract action against ORU, attaching the Lease to its complaint.

5

ORU then filed its answer denying material allegations, affirmative defenses, and a counterclaim, asserting Bal Harbour breached the Lease. In its counterclaim, ORU asserted Bal Harbour accepted the leased premises "as is" and was obligated to complete cosmetic repairs and open for business in a timely manner. It alleged Bal Harbour, however, breached the Lease because it failed to accept the premises "as is," and instead, demanded that renovations be made to the leased premises. ORU demanded payment of the balance due on the Lease.

Bal Harbour then filed its reply to ORU's affirmative defenses and an answer and affirmative defenses to ORU's counterclaim. Bal Harbour asserted that the "Rent Commencement Date" did not occur, and it was therefore entitled to the return of its first month's rent and security deposit paid to ORU.

In April 2023, the parties filed an amended pre-trial stipulation. The stipulation provided that "[Bal Harbour] seeks the return of prepaid rent and Security Deposit following the proper termination of the Lease prior to the rent commencement date. [ORU] seeks rent owed by [Bal Harbour] for its occupation of the Premises." Thereafter, the parties set forth several admitted facts, including that "[Bal Harbour] intended to operate a physical retail 'pop up' of its online Bal Harbour Shops Marketplace within the

6

Premises during Phase 1 and a permanent store in Phase 2 if the pop-up was successful." Further, prior to executing the Lease, Bal Harbour told ORU its initial cosmetic renovation plans included installation of furniture, fixtures, and equipment and changes to the floor, lights, and painting. Moreover, Bal Harbour contracted with a consultant to assist in all phases of the permitting process, a designer, and a general contractor. After the Lease was executed, Bal Harbour paid ORU the first month's base rent of $22,000 under section 3.4 of the Lease and the security deposit of $23,540 under section 4.1 of the Lease. Finally, on March 12, 2021, Bal Harbour provided ORU with thirty-days' notice of termination of the Lease, demanding the return of the prepaid rent and security deposit.

In the stipulation, the parties also set forth the following two issues of fact that remained to be litigated:

1. Whether [ORU] breached the Lease when [ORU] failed to return the prepaid rent and the Security Deposit to [Bal Harbour] following [Bal Harbour's] termination of the Lease on March 12, 2021.

2. Whether [] [Bal Harbour] breached its implied covenant of good faith by attempting to perform more than the initial cosmetic improvements that would allow it to open quickly, as contemplated by the parties to the Lease, resulting in the improper denial of rent due to [ORU].

The case proceeded to a half-day bench trial. At the hearing, the trial

7

court heard testimony from Bal Harbour's corporate representative, Matthew Lazenby ("Lazenby"), and ORU's corporate representative, Russ Chinnici ("Chinnici"), during which the Lease and several emails, including emails before the execution of the Lease, were addressed.

Lazenby testified to the following: Bal Harbour Marketplace "was an attempt to bring together all of our luxury brands under one roof." The purpose of the short-term Lease was to open pop-ups during the peak season at Ocean Reef Club, which coincided with the term of the Lease. Bal Harbour did not try to avoid opening for business. Rather, it expended a lot of time, effort, and resources attempting to get the premises open, including reducing the scope of work. Bal Harbour contracted with an architect, general contractor, and a permit expediter before entering the premises. Further, there was never the possibility that upon executing the Lease, it could immediately enter the premises and start selling products because "the types of spaces that [its] luxury tenants are used to operating in are Class A plus retail that they spend millions of dollars to . . . put their luxury image in front of their customers," and the leased premises was "probably less than Class B office." One of the emails before the execution of the Lease referred to "heavy cosmetic remodel," which was consistent with Bal Harbour's expectations, and redoing the floors, ceiling, and lighting was contemplated

8

and discussed.

Bal Harbour submitted two sets of permits to Monroe County—one that contemplated the immediate cosmetic remodel and a second that contemplated the remodel if Bal Harbour opted to extend the Lease. ORU never objected to the plans that it saw. In addition, a landlord needs to sign a Monroe County permit application, and Chinnici (ORU's representative) approved the permits sent to Monroe County.

Lazenby further testified that there was a clerical problem with the submission reviewed by the fire department. The submission incorrectly showed fire sprinklers, and the submission was subsequently corrected to reflect a fire alert system rather than sprinklers. An issue then arose when the fire marshal realized that the building had fallen out of compliance with the fire codes, and the Fire Marshal wanted to discuss the issue with the building owner to determine how the building could be brought back into compliance.

The Phase 1 permit was approved on March 11, 2021. Bal Harbour, however, decided to not commence the Phase 1 initial work and to terminate the lease based on the experience it had until then in trying to get permits. On March 12, 2021, Bal Harbour notified ORU it was terminating the Lease and requested the return of its rent and security deposit.

On cross-examination, Lazenby testified that the work contemplated in the initial work was described by him to Chinnici as "heavy cosmetic remodel," which would have included painting, replacing ceiling, flooring, and lighting, and mechanical back of the premises. The work required a permit. Lazenby also testified that Bal Harbour did not learn about the fire code violation until after it had signed the Lease; and later, his understanding was that the premises could not have been occupied until the issue was resolved with the Fire Marshal.

Moreover, in negotiating the Lease with ORU (Chinnici), Bal Harbour represented it would do the "absolute minimum necessary to open." Bal Harbour's staff was then instructed to do the "absolute minimum necessary" so that Bal Harbour's tenants would be willing to operate from the space, which would include painting, installing floor tiles, acoustical ceiling tiles, and lighting acceptable to tenants, having a functional HVAC, and ascertaining that the building complied with fire codes.

Lazenby acknowledged that Bal Harbour did not immediately pursue a permit for these initial renovations when the Lease was signed because Bal Harbour has very "demanding tenants," who spend millions on store buildouts. Bal Harbour "kept trying to find ways to make it suitable and expedite the timeline but, eventually, we ran out of time and had to terminate

10

the lease."

On re-direct, Lazenby testified that the Lease did not provide that Bal Harbour open for business without conducting any work on the property. Rather, the property "was offered in as-in condition with the express understanding [Bal Harbour] would be improving it." In addition, his understanding was that the Fire Marshal would only approve the permit for the initial cosmetic plans after ORU entered into an agreement to install the sprinklers. Thereafter, ORU met with the Fire Marshal in March 2021, and they worked out an agreement. Everyone was also working towards opening as soon as possible. Bal Harbour heard nothing but praise from ORU, and at no point was there communication from ORU that Bal Harbour was going beyond its scope of work until after the "dispute became a topic of conversation."

Bal Harbour rested. ORU moved for an involuntary dismissal arguing that Bal Harbour admitted that the absolute minimum required was to paint, change the floor, and "a permit that they leave all the MEP and fire suppression system and fire alert system in place." That work would have taken two to three weeks, and they acknowledged they did not do the absolute minimum necessary, which would have allowed them to open by January 15, 2021, as Bal Harbour advertised.

In response, Bal Harbour argued that the Lease has an integration clause that states the parties do not rely on any promises made prior to executing "[s]o this idea that [Bal Harbour] is in any way beholden to do the minimal possible, and that it somehow breached an oral agreement, is not supported in any way by law or facts."

Then, relying on Insurance Concepts & Design, Inc. v. Healthplan Services, Inc., 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001), ORU argued that under Florida law, "there is a covenant of good faith and fair dealing intended to protect the reasonable expectations of the contracting parties in light of their express agreement." ORU asserted Bal Harbour promised to do the absolute necessary to open as quickly as possible, but it did not do so. Instead, Bal Harbour's contractor in mid-January had to tell Bal Harbour that it needed to have a simpler plan if they wanted to open, and that simple plan would have been acceptable to Bal Harbour's tenants.

Bal Harbour's counsel then argued in part that it did no intentional act to avoid opening or occupying the leased premises. The trial court informed the parties that matter was for the trier of fact to resolve. The trial court then denied ORU's motion.

Next, ORU called its president, Russ Chinnici, as a witness. He testified to the following: his understanding was that Bal Harbour would

12

attempt to perform work that did not require permits, but "[i]t morphed from taking the space and doing simple pop-ups into a very exotic Bal Harbour experience[.]" But Chinnici never objected because he testified "[i]t would not be in [his] self-interest to object to that." He did, however, expect Bal Harbour to pay rent from day one of the Lease. Chinnici explained that after receiving the first month's rent, he was trying to figure out how to treat the payment, for example, "should [he] prorate" the payment. He was then trying to communicate with Bal Harbour, "[S]o I said, you know what, let me just give them December free. Let's get the ball rolling and move on." Therefore, he applied the $23,540 to January's rent. He then invoiced Bal Harbour for February's rent, but Bal Harbour did not pay February, March, or April's rent. Chinnici added that the moment Bal Harbour received the keys, it opened because it is in the business of subletting space, and Bal Harbour was already talking to clients.

On cross-examination, Chinnici testified that after ORU invoiced Bal Harbour for rent, Bal Harbour responded for clarification, stating: "Per Section 3.1. Base Rate: 'Rent Commencement Date' is defined as due upon opening, which is TBD right now. I reached out to my Const. Dept for an Anticipated Date." On February 2, 2021, ORU responded, stating: "To confirm, we have your first month's rent and security deposit. . . . I will stand

13

by and wait for you to open to commence rent." Chinnici testified that he responded in that manner because he was "try[ing] to save the deal because [he] saw there was complications going on. So in [his] best interest, it was best to cooperate instead of blowing up the whole program and not having a potential tenant." However, he considered the leased premises already open because "[Bal Harbour is] in business subletting space," and Bal Harbour already had customers going in and picking which space they wanted. Chinnici further testified that Bal Harbour did the initial work because "[Bal Harbour] poked around the ceilings. [Bal Harbour] said, 'All right, guys, we know what we got to do here, marshal our resources and put plans together and let's get going.' So they were in business."

Based on the trial court's questioning, ORU testified that its current tenant of the premises has the same fire system that was present in January 2021. The trial court requested that the parties submit written closing arguments and proposed final judgments, which the parties did.

The trial court entered a final judgment for ORU. The trial court found, among other things, that the Lease provided a term commencing upon execution until April 30, 2021. When the premises was delivered to Bal Harbour, it was in code compliance and ready to be occupied. The Lease also allowed Bal Harbour to extend the Lease to April 30, 2030, and if

14

extended, Bal Harbour would be granted up to a six-month rent abatement to complete the extensive renovations. Under the Lease, Bal Harbour paid the first month's rent and security deposit.

The trial court found that the Lease provided that the rent obligation would not commence until Bal Harbour substantially completed its "Initial Work" and opened for business. Importantly, the trial court determined that Bal Harbour opened for business upon execution of the Lease on December 14, 2020, explaining, "[Tenant] is a commercial landlord, which intended to sublease portion of the leased premises to commercial tenants and had commenced negotiations with potential subtenants commencing prior to and after execution of the lease." The court further found that the term "Initial Work" is not defined in the Lease, but the parties "entered into an express agreement that the 'Initial Work' would be limited to what was 'absolutely necessary' in order to open for the season at Ocean Reef." Later, Bal Harbour decided that the "absolutely necessary" "Initial Work" would be limited to "paint, install time, and repair acoustical ceiling tile as needed." Bal Harbour advertised in the Ocean Reef community that it would open on January 15, 2021.

The trial court also found that "[Tenant] did not attempt to substantially complete the Initial Work, but immediately focused on the design and

15

implementation of the more extensive renovations contemplated in the event the Lease extension option was exercised." After Bal Harbour's general contractor advised it that the extensive plans would not allow it to open quickly, it was then that Bal Harbour "pursued simple plans for the Initial Work." Bal Harbour did not request the plans for the Initial Work from its architect until January 15, 2021, a month after it executed the Lease. Bal Harbour submitted separate permit applications—(1) plans for the Initial Work and (2) plans for the extensive renovation contemplated if Bal Harbour opted to extend the Lease. The Monroe County Building Department and Fire Marshal reviewed the separate plans simultaneously, resulting in extensive delays in the permitting process.

The trial court stated that ORU claimed that after Bal Habour vacated the premises, ORU incurred expenses in repairing the premises in the amount of $8,111.00.

In its conclusions of law section, the trial court stated that "Florida contract law recognizes the implied covenant of good faith and fair dealing in every contract," which is to "protect 'the reasonable expectations of the contracting parties in light of the express agreement.'" The court also concluded:

> Bal Harbour entered into an express agreement with
> ORU that it would do the minimum work necessary,

16

open and commence rent quickly. [Bal Harbour] breached in [sic] implied covenant of good faith and fair dealing by failing to timely act in furtherance of its express agreement with ORU to perform the absolute minimum improvements necessary and open, which would initiate its obligation to pay rent to ORU under the Lease.

As to damages, the trial court found that the rent obligation commenced three months before Bal Harbour's termination of the Lease. ORU had been paid one month's rent and the security deposit in the amount of one month's rent. Therefore, Bal Harbour still owed ORU rent in the amount of $23,540. However, ORU failed to prove that it incurred damages that exceeded normal wear and tear, and it also failed to provide any supporting receipts in support of the amount claimed. The trial court thus awarded damages of $23,540 to ORU. The court also found ORU was the prevailing party, and thus, was entitled to attorney's fees, costs, and interest. Thereafter, the trial court denied Bal Harbour's motion for rehearing and/or reconsideration, and/or to alter or amend the judgment. Bal Harbour now appeals

## ANALYSIS

"The interpretation of a lease agreement is a question of law and the applicable standard of review is de novo." 4350 NW 8 Terrace, LLC v. Com. Laundries, Inc., 411 So. 3d 572, 576 (Fla. 3d DCA 2025) (quoting Covelli

17

Fam., L.P. v. ABG5, L.L.C., 977 So. 2d 749, 752 (Fla. 4th DCA 2008)). "Further, 'when the language [in a contract] is clear and unambiguous, it must be construed to mean "just what the language therein implies and nothing more."'" Dezer Intracoastal Mall, LLC v. Seahorse Grill, LLC, 277 So. 3d 187, 190 (Fla. 3d DCA 2019) (quoting Walgreen Co. v. Habitat Dev. Corp., 655 So. 2d 164, 165 (Fla. 3d DCA 1995)). But, "if a contract is ambiguous, the court must construe it pursuant to the parties' intent." Charbonier Food Servs., LLC v. 121 Alhambra Tower, LLC, 206 So. 3d 755, 758 (Fla. 3d DCA 2016). Finally, following a bench trial, the trial court's findings of fact will not be disturbed on appeal if supported by competent, substantial evidence. Parque Towers Devs., LLC v. Pilac Mgmt., Ltd., 395 So. 3d 189, 191 (Fla. 3d DCA 2024).

## A. Rent Commencement Date in Lease

Bal Harbour argues that under the express terms of the Lease, which are unambiguous, the "rent commencement date" had not commenced because it had not (1) substantially completed the "initial work," and (2) opened for business in the leased premises. We agree with this position.

Here, numerous emails were sent before the execution of the Lease, which were introduced into evidence and addressed. Even so, as the provisions in the Lease are clear and unambiguous, the trial court was

required to construe the Lease based solely on the unambiguous provisions of the Lease. In addition, section 13.8 of the Lease provides that the "Lease contains the entire agreement between the parties."

Section 3.1 of the Lease, titled "Base Rent," defines the "Rent Commencement Date" as the date when "[Bal Harbour] has substantially completed [Bal Harbour's] Initial Work and opened for business in the leased premises." The trial court stated in the final judgment that the Lease does not define the term of "Initial Work." However, Section 5.3 of the Lease specifically sets forth the work anticipated during the initial phase of the cosmetic renovations to the leased premises:

> Section 5.3. Alterations. Except for the initial cosmetic renovations (**including without limitations**, installation of FFE [furniture, fixture, and equipment] and changes to floors, lights and painting), [Bal Harbour] shall not make any alterations in or to the leased premises without first obtaining the written approval and consent from [ORU], which approval and consent may not be unreasonably delayed, conditioned, or withheld.

(emphasis added). Thus, Bal Harbour's initial work could include any cosmetic renovations. Accordingly, the trial court's definition of "Initial Work" was not consistent with the Lease provision in section 5.3. Rather, the trial court's definition of "Initial Work" was improperly based on pre-contracting emails that provide that the initial work is to "be limited to what was

19

'absolutely necessary' in order to open for the season at Ocean Reef." Admittedly, the plans submitted when filing the permit application for the Phase 1 cosmetic renovations were simpler than what was permitted under section 5.3 of the Lease. Nonetheless, the trial court erred by relying on the emails when defining the term "Initial Work."

The trial court also found that Bal Harbour "opened for business upon execution of the lease on December 14, 2020." In making this determination, the trial court also found that Bal Harbour "is a commercial landlord, which intended to sublease portion of the leased premises to commercial tenants and had commenced negotiations with potential subtenants commencing prior to and after execution of the lease." The finding that Bal Harbour opened for business upon execution of the Lease is not supported by competent, substantial evidence, or by the Lease itself.

For example, Section 5.1 of the Lease provides that "[Bal Harbour] shall use and occupy the leased premises for operations of an extension of the 'Bal Harbour Shops Marketplace', including the right to display and sale, at retail, goods, . . . including popup uses . . . ." That never occurred. Further, the trial court's construction of the Lease is at odds with the definition of "Rent Commencement Date" in the Lease. In addition, the trial court's construction is contrary to the parties' pre-trial stipulation, which provides that Bal Harbour

20

"intended to operate a physical retail 'pop up' of its online Bal Harbour Shops Marketplace with the Premises during Phase 1 and a permanent store in Phase 2 if the pop-up was successful." A pop-up store, either temporary or permanent, did not open in the leased premises. Thus, the trial court's finding that Bal Harbour "opened for business" is not supported by competent, substantial evidence, the terms of the Lease, or joint pre-trial stipulation.

**B. Application of Implied Covenant of Good Faith and Fair Dealing**

Bal Harbour also argues the trial court erred by finding that it breached an implied covenant of good faith and fair dealing. Bal Harbour is correct.

"Florida contract law does recognize an implied covenant of good faith and fair dealing in every contract[,]" which is "intended to protect the reasonable expectations of the contracting parties in light of their express agreement." QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc., 94 So. 3d 541, 548 (Fla. 2012) (internal quotation marks and citations deleted). "A duty of good faith must 'relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.'" Id. at 548 (quoting Ins. Concepts & Design, Inc., v. Healthplan Servs., Inc., 785 So. 2d at 1232, 1234 (Fla. 4th DCA 2001))

21

In its final judgment, the trial court concluded Bal Harbour breached its implied covenant of good faith and fair dealing. In doing so, the trial court stated:

> Bal Harbour entered into an express agreement with ORU that it would do the minimum work necessary, open and commence rent quickly. [Bal Harbour] breached in [sic] implied covenant of good faith and fair dealing by failing to timely act in furtherance of its express agreement with ORU to perform the <u>absolute minimum improvements necessary</u> and open, which would initiate its obligation to pay rent to ORU under the Lease.

(emphasis added).

However, the record reflects that the Lease does not provide that Bal Harbour would perform the "absolute minimum improvements necessary" to open the leased premises. Thus, the trial court's finding that Bal Harbour breached its implied covenant of good faith and fair dealing was not based on an express term of the parties' Lease. Moreover, Bal Harbour did not breach an express term of the Lease. Bal Harbour attempted to obtain permits for the initial work, but there were delays in obtaining the permit. Thereafter, Bal Harbour opted to terminate the Lease based on permitting issues it experienced. Consequently, the trial court erred by finding that Bal Harbour breached an implied covenant of good faith and fair dealing.

22

## CONCLUSION

Based on the unambiguous terms of the Lease, the "Rent Commencement Date" did not occur. The trial court's final judgment was based on findings that are not supported by either the Lease itself or by competent, substantial evidence. Accordingly, we reverse the final judgment entered against Bal Harbour and in favor of ORU, as well as the denial of Bal Harbour's motion for rehearing and/or reconsideration, and/or to alter or amend the final judgment. We remand with instructions that final judgment be entered in Bal Harbour's favor on its claim for breach of the Lease against ORU, with damages awarded to Bal Harbour in the amount of its pre-paid rent ($22,000) and security deposit ($23,540), as well as a finding that Bal Harbour is the prevailing party.

Reversed and remanded with instructions.